IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:06cr126-WHA |
| | ) | |
| JOHN JENNINGS, II, | ) | |
| | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

The case is currently pending on motions by defendant to suppress defendant's Statements (Doc. # 27) and certain Searches (Doc. #26). As to defendant's statements, defendant seeks suppression of the confession given in response to police questioning on April 25, 2006. As to the searches, defendant seeks suppression of the search of defendant's personal bag, and the belongings contained therein, performed on April 25, 2006.[1] Evidentiary hearings were held on December 7, 2006, and January 30, 2007. In addition to the testimony, certain Exhibits were considered including the forensic report prepared by the Federal Bureau of Prisons by order of this Court. (Doc. #15) Upon consideration of the motions, and the testimony at the evidentiary hearings, the Magistrate Judge RECOMMENDS that the motions be DENIED.

**I. FACTS**

At the suppression hearing held on December 7, 2006, (Doc. #45; "TR1"), the

---

[1] Defendant relinquishes his motion as to (1) the search of his mother's apartment (1516 Bay Area Blvd. Ap. 22, Houston, Texas 77058)(See TR 114), as the mother's consent was given; and (2) defendant's internet mail and communication accounts, as the computer belonged to his father, and consent was given by the father. (See, TR 115)

government called Postal Inspector, Jeff Arney ["Arney"], who is responsible for criminal misuse of the mail particularly in regard to child sexual exploitation, to testify on the government's behalf. (TR1- 4)  In this capacity, he began reviewing communications between defendant and a detective posing as a 13-year-old female.  Based on those communications, a letter sent by defendant with five dollars for transportation to a hotel and a picture of defendant, a criminal complaint was filed on April 21, 2006 (Doc. #1). Defendant had previously contacted the bus line and obtained information as to how he could get a minor on a bus unaccompanied by an adult.  He was told that an adult would have to pick up the ticket.  He emailed "Ms. Montgomery," who was actually an undercover detective, with instructions. (TR1- 53-54)  Arney also testified, per information contained in alleged emails, that defendant also indicated that "Ms. Montgomery should ship her computer to him to allegedly hide where she would be living, and to compose a letter giving her permission to travel and live with defendant." (TR1- 54)

At the bus stop, defendant was identified by his picture and because he was holding pink flowers and a sign saying, "Welcome Home, Kathy Montgomery." (TR1- 14, 41)  Defendant was approached and asked to "escort" Arney to "his office:" a room in the bus station set up for the purpose of talking to defendant about his communications with Montgomery. (TR1- 12-14, 35-37)  Defendant complied.  At some point, defendant was told that he was under arrest, though this testimony by Arney is equivocal.

After taking defendant into custody, Arney asked defendant if he could read and write, and it appeared to Arney by his body language that he understood the questions posed to him. (TR1- 16)  Arney then showed defendant a *Miranda* Warning and Waiver of Rights form, and a Sworn Statement with Rights form, and asked him to read along with him while he read them aloud to defendant in their entirety. (Doc. 35, Exh. 2, TR1- 16-21, 45-48)  Subsequent to signing these documents, defendant spoke to Arney, and composed a written statement. (Doc. #35, Exh. 3)  Arney watched what defendant wrote, and asked for clarification at various points. (TR1- 24)  Defendant was then shown Doc. #35, Exhs. 4, 5 and 6: Consent to Search forms pertaining to (1) his bag and personal belonging, (2) his mother's Bay Area house, and (3) internet and email accounts found on his father's computer.  Arney testified that defendant was again read these forms and asked to sign them.  Defendant also provided email accounts and passwords. (TR1- 26-31)  Arney indicated that defendant did not appear to suffer from any handicap during his conversations with defendant. (TR1- 33)

At the continued suppression hearing held on January 30, 2007, (Doc. #58), the defendant called witness, Katherine Lee Boyer ["Dr. Boyer"], a clinical and forensic psychologist since 1986. (TR 2)  Dr. Boyer examined defendant on three different occasions, for a total of four-and-a-half hours. (TR 3)  In addition, Dr. Boyer reviewed investigative records, including emails attributed to defendant; a copy of defendant's written statement; a summary of defendant's verbal statement; and the psychological

evaluation conducted in 2006 by the Federal Bureau of Prisons ["FBP Report"].[2] She also interviewed defendant's father, mother and the father of a young man he attended school with to assess defendant's developmental history. (TR 4) Defendant was described as someone who banged his head repeatedly on the floor as a child, necessitating the need for a special helmet (TR 6, 7), and later in life, at 14- or 15-years-old, wetting the bed when he stayed with his father. (TR 5) He was also described as having developmental delays as to speech (four years old), indicating a learning problem limited to language. (TR 6-7) Defendant was in special education for at least part of his school education, and the school recommended that he be put in a special program to learn daily living skills, but his father did not allow him to be placed in the program. (TR 8) A friend of defendant's[3] indicated that he was in special education through his junior and senior years, but was unsure if defendant ever got a high school diploma. (TR 10)

      Dr. Boyer observed the following about defendant: (1) that he had difficulty comprehending or interpreted what she said in an idiosyncratic and unusual way (TR 10), and (2) that he couldn't tell the difference between reality and fantasy. (TR 13) As to his intellectual functioning, Dr. Boyer administered the Peabody Picture/Vocabulary Test (3rd Ed.) (on which he scored on the picture portion significantly below average, an 88; and

---

[2]This report, prepared by Dr. Jason V. Dana, Psy.D., was admitted without objection at the first hearing on December 7, 2006, as Plaintiff's Exhibit 1.

[3]David Chilton was the father of defendant's classmate in high school. (TR 10)

on the verbal portion a 77).[4] (TR 17)  Defendant was also given the Personality Assessment Inventory, which was found "not valid" because Dr. Boyer suspected defendant did not comprehend the meaning of the overall sentences and may have given some unusual interpretations to what the question was asking for. (TR 19) She did not find him purposely deceptive, malingering (TR 20, 52) or lying (TR 12).  As to his ability to understand his *Miranda* rights, Dr. Boyer administered the Grisso[5] tests.  As to the "comprehension" portion, defendant scored a three out of eight (below borderline, TR 26); as to "comprehension recognition," defendant scored a nine out of twelve (middle range of juvenile, TR 27-28); as to *"Miranda* vocabulary," defendant scored six out of twelve (TR 28), and as to "function of rights in interrogation," defendant scored twenty-five out of thirty. (TR 29)  She concluded, based on her testing, defendant's statements and the language in particular forms he was read, that it was highly unlikely that defendant fully comprehended the literal meaning of his *Miranda* rights and, more importantly, the implications of waiving them. (TR 22, 29-30)[6]  Dr. Boyer also indicated

---

[4]Dr. Boyer indicated: "…for single vocabulary words he was able to understand to some degree better than he's able to express", but that he was unable to understand the meaning of the word, 'right' as it is meant, 'like the right to vote.'" (TR 18, 21, 28-29, 80-81, 101-102, 104-105)

[5]These are tests developed by forensic psychologist, Thomas Grisso.  They are based on research that involved the input of both legal professionals and mental health professionals. (TR 20-21)

[6]It is uncontested, for the purpose of the psychological evaluation, that defendant was read his rights, said he understood them, and signed a consent form before questioning began. (TR 23) Dr. Boyer also assumed that there was no force, coercion or intimidation used at the time of questioning, and that he was conscious and adequately alert before questioning, though defendant did not recall being read the rights at that time. (TR 24)

that defendant did not understand the ramifications of executing the waiver of rights, the nature of the waiver he was executing, or the consent form he signed for the search of his property. (TR 32-33)

On further questioning it was determined that defendant was twenty-three years old (TR 35), had a diagnosis of posttraumatic stress disorder (TR 49), had inconsistencies with affect and emotional expression as it was observed by Dr. Dana in the FBP Report (TR 50), that he was borderline functioning[7] in terms of intelligence (TR 53), that he understood the charges against him, understood the roles of key courtroom personnel (TR 53, 57), understood various legal decision (TR 54), including the ability to obtain counsel (TR 60-61), but that he was operating at an I.Q. score of 76 (average being 90 to 109, TR 55). Dr. Boyer had some concerns about defendant assisting in his own defense because of his diversion into "extreme elaborate fantasy stories..." could interfere with counsel's efforts to assist defendant. (TR 56) She disbelieved that he was an ordained minister, but believed that he had been working at a Mexican restaurant for a period of time (TR 62), and that he was capable of taking the bus various places and used a computer at the public library. (TR 63) She agreed that defendant was able to strive for goals, able to engage in simple monetary transactions and that defendant indicated he purchased a bus ticket. (TR 66) Defendant is able to put words together to form sentences and spins coherent

---

[7]On later explanation, Dr. Boyer indicated that "borderline" is very low functioning, but is not considered "mentally retarded;" however, she felt his condition was more severe than a "learning disability." (TR 64)

fantasies. (TR 67)

Dr. Boyer agreed that defendant's statement was a comprehensible recitation of certain events (TR 67-68), but did not believe that he understood his "right" to have a lawyer prior to questioning or during questioning (TR 70), though defendant was capable of understanding information presented to him in a more simplistic concrete way. (TR 91-92)  Dr. Boyer admitted that the forms administered by Arney used less complex language than the forms used in the *Miranda* test. (TR 92)[8]  However, she maintained her position that in some ways the forms were more difficult because they used the word "right" several times.  She further stated that, if information is given to defendant, and he has the time to digest it, "he may or may not understand it even with time," (TR 93) and likely would not verbalize if he does not understand, (TR 94) but has the capacity to verbalize objections and weigh the information at a very minimal level. (TR 95-96)  Dr. Boyer felt defendant would have had similar difficulties with the search consent forms if the language on the form were similar to that of the statement consent forms. (TR 103)

While the FBP Report did not differ substantially as to assessment of intellectual abilities, the report concluded that defendant was competent to stand trial:

> The issue of Mr. Jennings' competency to proceed to criminal adjudication is predicated on whether he suffers from a severe mental disease or defect, the result of which he is unable to understand the legal proceedings or to properly assist in his defense.  At the present time, Mr. Jennings appears to meet diagnostic criteria for borderline intellectual functioning (76), as

---

[8] It is noted that the evaluation by the Bureau of Prisons tested only for competency to stand trial, and did not test for defendant's understanding of *Miranda* rights. (TR 99)

indicated by the WAIS-III results. Despite his borderline intellectual functioning, Mr. Jennings' ability to understand the legal proceedings and to properly assist his counsel do not appear to be noticeably impaired at this time. Although he may have a difficult time understanding lengthy, detailed verbal explanations, he is capable of understanding information that is presented to him in a more simplistic, concrete manner. The defendant presently appears to be appropriate for continuation of judicial proceedings. (FBP Report, pp. 10-11)

It did not specifically address whether he understood his *Miranda* rights, but did give an assessment as to his written, verbal and visual abilities, as well as his ability to reason abstractly, anticipate the consequences of specific actions and assist with his defense. (FBP Report, pp. 7-8) He was further found to have the capacity for cooperative interactions with an individual in the pursuit of a mutual goal, and was appropriate, cooperative, and compliant with all request made of him. "He demonstrated the ability to express his views, while at the same time considering alternative information and possibilities." (FBP Report, p. 8) He was diagnosed with borderline intellectual functioning, and a provisional diagnosis of post-traumatic stress disorder (PTSD), due to re-experiencing of a traumatic event (childhood sexual abuse) for which he had re-current thoughts and nightmares. (FBP Report, p. 9)

## II. DISCUSSION

Counsel for defendant argued that defendant's mental limitations prevented him from understanding both the *Miranda* concepts and the search concepts contained in the verbal recitations and written consent forms that defendant signed (1) prior to

participating in giving oral and written statements, and (2) prior to consenting to various searches. Defendant's attorney claimed, as a result, that the government violated defendant's Fifth Amendment protections against self-incrimination. As indicated previously, the only search that defendant is now objecting to is the search of his bag and personal effects that he had with him at the time he was taken into custody. The government argued, largely based on the testimony of postal inspector Arney and the FBP Report, that defendant was of sufficient intellect to consent, and did consent, to giving both verbal and written statements, and to the various searches; and that same were given voluntarily, knowingly and intelligently.

    *A.*    *Consent to Oral and Written Statements*.

The Fifth Amendment requires that persons in police custody be given certain protections. Among them are the (1) right to remain silent and (2) the right to assistance of counsel prior to interrogation. *Miranda v Arizona*, 384 U.S. 436 (1966). These rights can be voluntarily relinquished by waiving them, but in order for this to occur, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v Burbine,* 475 U.S. 412, 421 (1986). If interrogation continues without the presence of an attorney and a statement is taken, the burden rests with the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to appointed counsel. *Cooper v Griffin*, 455 F.2d 1142, 1145

(5th Cir. 1972),[9] *citing*, *Escobedo v Illinois,* 378 U.S. 478, 490, n. 14 (1964). Mental illness can interfere with a defendant's ability to make a knowing and intelligent waiver of his *Miranda* rights.[10] Under such circumstances, however, competency to make such a waiver is determined by whether the individual had a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran,* 475 U.S. at 421; *see also U.S. v Barbour,* 70 F.3d 580, 585 (11th Cir. 1995). "Only if the 'totality of the circumstances' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran,* 475 U.S. at 421(*quoting Fare v Michael C.,* 442 U.S. 707 (1979); *Barbour,* 70 F.3d at 585.

Defendant's attorney claims that "the police took advantage of Mr. Jennings' mental limitations. Mr. Jennings' demeanor and manner clearly and objectively presents an individual who has limited mental functioning, is easily confused, and easily manipulated." (Brief, Doc. #27, p. 3) However, Arney testified that defendant did not appear to suffer from any handicap during his conversations with defendant during the period of time when he was read his rights, signed the consent form and wrote his

---

[9] The Eleventh Circuit, in the en banc decision of *Bonner v City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[10] The former Fifth Circuit held that mental retardation can render a defendant incapable of intelligently waiving the *Miranda* rights. *Miller v Dugger,* 838 F.2d 1530, 1539 (11th Cir. 1988), citing, *Cooper,* 455 F.2d at 1145.

statement. (TR1- 33)  Dr. Boyer could not point to any information that would lead to the conclusion that Arney or the individual's questioning defendant, might know that defendant mental functioning was limited, even though they may have thought him "odd," (TR 113), and she admitted that defendant would not have been one to verbalize if he did not understand things. (TR 94)

"The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary; there must be coercion by an official actor." *Barbour*, 70 F.3d at 585. Thus, the fact that defendant was functioning in the borderline range, with possible PTSD, does not render his statements involuntary unless Arney, or the questioning detectives, took advantage of his limited abilities.  *Id*. at 585.  In this case, the detective read the statement out loud to defendant, asked if he understood it and asked him to sign the form.  Arney "assisted" defendant in the writing of the statement only to the extent that some area might need further explanation. (TR1- 23-24)  They gave defendant a beverage and some crackers on the way down to the police station. (TR1- 25)  In light of these facts, it is concluded that there was no psychological or physical coercion.  Thus, there is no basis for declaring defendant's consent to give both oral or written statements involuntary.[11]

As to the additional requirement that defendant make a knowing and intelligent waiver of his *Miranda* rights, defendant's attorney argues that "Mr. Jennings, at best, has

---

[11] It should be noted, based on *Barbour,* 70 F.3d at 585, that these facts also go to the issue of whether the *search of defendants bag and personal property* was voluntary. (*See*, *Infra,* p.8)

a verbal I.Q. of 76; he had been enrolled in special education courses his entire life; and he is in need of charts and illustrations to understand lengthy or complex verbal explanations." (Brief, Doc. # 27, p. 3)  These positions are substantiated by both forensic examinations.[12]  Dr. Dana additionally indicates that "[a]lthough he [defendant] may have a difficult time understanding lengthy detailed verbal explanations, he is capable of understanding information that is presented to him in a more simplistic, concrete manner." (FBP Report, p. 10)  Conversely, even though Dr. Boyer agreed that defendant was capable of understanding information presented to him in a more simplistic concrete way (TR 91-92), she did not believe that he understood his "right" to have a lawyer prior to questioning, or during questioning (TR 70), or that he understood the *Miranda* forms that he signed. (TR 71-72)  Dr. Boyer also testified that, while defendant did not understand the meaning of the word "right," as it is used in the context of the consent form, he understood at the time Dr. Boyer tested him that he did not have to talk to the police. (TR 102)

    Defendant must understand his constitutional right to refuse consent to interrogation, before abandoning it.  Other factors that may be considered when making this determination when defendant's intellect is limited are age, intelligence, education, language ability, degree to which the person cooperates with the police, length of

---

[12]Except for confirmation that defendant was in special education "all his life," there is certainly an indication that he was in special education for a least part of his academic years, and both Dr. Dana and Dr. Boyer confirm an I.Q. of 76, and the need for special explanation of difficult facts.

detention and nature of the questioning. *Coleman v Singletary,* 30 F.3d 1420, 1426 (11th Cir. 1994). There is no dispute that defendant was an individual with significant cognitive/intellectual limitations, particularly when verbal skills are required (Doc #53, p. 15), and when complex explanations are given. (Doc. #19, p. 10) But he was 23-years-old, and not a minor, and so had more experience in life. He had reached the twelfth grade, and allegedly went to school to be a minister. He was able to communicate coherently to the extent that he could spin fantastic stories about his life. He had the capabilities to live independently (for a period of up to two years), care for himself, maintain friendships, travel about by bus, use some means to purchase necessities (either cash or credit cards) and correspond by mail and email (this also indicates a basic knowledge of computers). Lastly, if the testimony is to be believed, defendant arranged to have a bus ticket made available for someone he knew to be a minor for purposes of her traveling to another state to meet with him and go to a motel.[13]

In *Moore v Dugger*, 856 F.2d 129 (11th Cir. 1988), the court found that the petitioner had an I.Q. of 62, functioned at the intellectual level of a eleven-year old, and was classified as mentally handicapped. He had also been deprived of food or sleep for twenty-five to thirty hours prior to questioning. Despite these facts, the court found that

---

[13] These last assertions were made by Arney in reference to E-mail correspondences not in evidence. (TR1- 8-9) It is noted that this differs from the handwritten statement (which was agreed to be put in as evidence for purposes of the evidentiary hearing only - otherwise this entire issue becomes moot) of defendant wherein he indicates that he planned to have Kathy Montgomery "come live with me" more in the form of girlfriend and wife, that he would never have her do anything against her will, but there were indications that he wanted to have sex. (Doc. #35, Exh. 3)

he was "an educable mentally handicapped student," had made it to the eleventh grade, and acknowledged in his testimony at trial "that he had been told he could have a lawyer." *Id.* at 134-5. The court concluded that "[i]t is clear that petitioner was advised of his *Miranda* rights, understood then [*sic - them*], and signed a card to verify that he understood." *Id.* at 134. The court concluded, under these circumstances, the waiver was not only voluntary, but intelligently given. *Id.* at 134.[14]

In the instant case, because the experts disagree, a choice must be made. Hence, in light of the totality of the circumstances, particularly defendant's higher level of functioning[15] and his ability to understand simple and concrete information,[16] particularly non-verbal information, and the additional fact that the forms were not complex (TR 92), it is the finding of this court that the government met its burden of proving that defendant competently and intelligently waived his right to counsel prior to giving both oral and

---

[14] *But see*, *Cooper v Griffin,* 455 F.2d at 1145 (the court distinguish this case on the basis that it involves a mentally handicapped minor); *see also*, *Fare,* 442 U.S. at 724. The two cases that defendant's attorney cites in his brief, *Barbour,* 70 F.3d at 586, found that defendant's severe depression did *not impair* his ability to understand the waiver of his *Miranda* rights; and the court in *Miller v Cooper*, 838 F.2d 1530 (11th Cir. 1988), never reached the issue presented herein because counsel never had the opportunity to argue the issue of voluntariness below. While the reviewing court found this oversight as error by the trial judge, it was also found to be harmless error in light of the other overwhelming evidence of guilt presented at trial. *Id.* at 1540-41. But this court also notes that the case cited by plaintiff, *Coleman*, 30 F.3d 1420, is also distinguishable because in that case there was *uncontroverted* testimony by two experts that Coleman had the capacity to make a knowing and understanding waiver of his rights. In the instant case, the experts diverge in some respects in their conclusions as to the issue of competency.

[15] *See* Argument "A", p. 13.

[16] Dr. Dana notes: "The difference between the verbal and performance scales was statistically significant, therefore suggesting that Mr. Jennings' non-verbal abilities are more refined than his verbal abilities. (FBP Report, p. 7)

written statements.

    *B.  The consent to search.*

As to the right to be free from warrantless searches without probable cause, that right is protected by the Fourth Amendment. *Katz v United States,* 398 U.S. 347, 352-353 (1967).  An individual may freely and voluntarily waive this right and grant law enforcement to conduct a search, even though the consent is given while that person is in custody.  *U.S. v Elrod*, 441 F.2d 353, 355 (5th Cir. 1971), citing *U.S. v Mitchell,* 322 U.S. 65 (1944).  "Consent means knowing approval." *Elrod*. 441 F.2d at 356.  As the standard that a consent to *searches* be made voluntarily, knowingly and intelligently, is the same as for the waiver of defendant's Fifth Amendment right regarding self-incrimination under *Miranda*, see *Barbour,* 70 F.3d at 585 and *Colorado v Connelly,* 479 U.S. 157, 169-70 (1986); and similar forms,[17] essentially, were used with some modification as to place or item to be searched; the analysis of defendant's behavior, intellect and understanding of the consequences of his actions as to the searches is the same.  The forms used[18] for the consent to search were simplistic and concrete; they were not lengthy; they were read by the detective to defendant; defendant was asked if he understood them, and after indicating his verbal understanding, signed the three forms.  Neither Dr. Dana or Dr. Boyer review these particular forms with defendant.  Thus, it is our finding that given the

---

[17]Doc. #36, Exhibit 2 and 3.

[18]Doc. #35, Exhibit 4, 5 and 6.

testimony presented as to defendant's capabilities, his understanding of simple concepts and verbal explanations as indicated by the experts, the government met its burden of showing that defendant consented to the search of his personal bag and it contents.

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motions to suppress defendant's Statements (Doc. # 27) and certain Searches (Doc. #26) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation within a period of 13 days from the date of mailing or transmittal to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon

grounds of plain error or manifest injustice.[19]

DONE this the 2nd day of March, 2007.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

---

[19]*Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner*, 661 F.2d 1206.